McKinney, J.,
delivered the opinion of the Court.
The complainants are the children and heirs of James Lowry, who died intestate, about the year 1838. They brought this bill, to recover a lot in the town of Mur-freesboro, alleged to have been purchased with their money, by their guardian, in Ms oivn name.
The widow of the intestate took out letters of administration upon the intestate’s estate: and afterwards, in the year 1836, intermarried with one Richard Allman, from whom she separated in about a year after the marriage. Shortly after the marriage, said Allman was appointed guardian for complainants, who were then infants of tender age. Some time after his appointment as guardian, said Allman purchased the house and lot in question, for which he paid the sum of $1,800. In 1842, Allman was declared a bankrupt, and said house and lot were sold by the assignee in bankruptcy, and purchased by Walker & Edwards, who, in 1846, sold and conveyed the same by deed of quit claim, to the defendant Brown, for the sum of $1,400.00. Allman died before the filing of this bill, leaving his widow surviving him.
The bill charges that the entire consideration money of the property, was paid out of the funds belonging to the complainants, in the possession of Allman, as their guardian, and that defendant, Brown, purchased the property with a full knowledge of that fact. The proof shows, that' James Lowry, the father of complainants, left *458 an estate of the value of some three or four thousand dollars, which had been mostly converted into money, prior to the marriage of Mrs. Lowry with Allman. The widow of Allman, (formerly Mrs. Lowry, and administratrix of said Lowry’s estate,) was examined as a witness for complainants. She proves very fully, if her testimony be admissible, the allegation of the bill, thp.t the purchase was made by her husband, Allman, with the money of his wards. Her competency as a witness, however, is denied.
But, aside from her testimony, there is other testimony sufficient, perhaps, to support the bill. The witness, Mrs. Dill, proves expressly, that at a time subsequent to the purchase of the property by Brown, Allman told her, that he had paid for the property with money belonging to his wards.
Leaving out of view, the general understanding of the neighbors, that such was the fact, the character, and pecuniary condition of Allman, at the time of the purchase, as proved by most of the witnesses, are persuasive of the truth of the bill. He was a man of profligate character, a drunkard and gambler: whose employment was that of “ keeper of a small tippling grocery.” Notwithstanding the vague, general estimate, and statements of some of the witnesses, it is utterly impossible to resist the conclusion, that ho was not possessed of the means of making the purchase, otherwise than by the misappropriation of the trust fund in his hands, in whole, or in part, at least.
The defendant, Brown, in his answer, denies that he purchased the property with the knowledge of the fact, that it had been paid for by Allman, with the money of his wards, and asserts that he is a bona fide purchaser for a valuable consideration, without notice.
*459 This ground of defense cannot, we think, be sustained, in view of all the circumstances of the case. The proof abundantly establishes, that there existed a great intimacy between the defendant and Allman, for a long time previous to the purchase of the property by the latter. They lived in the same village, were engaged in the same business, and their associations and intercourse, were constant, familiar, and apparently confiding ; and it is almost impossible to resist the conclusion, that the defendant could not possibly have been ignorant of the fact, notorious to every one, that Allman was not possessed of the means of paying for the property in any other way than by the use of the funds of his wards. And that he did misapply the fund, and utterly fail to account to his wards for the same, except some small amounts for tuition and clothing, is shown by his last settlement with the Clerk, in 1842.
But, another matter relied on to charge the defendant with notice in regard to the title, is, that he agreed to accept, and did receive, a mere quit claim deed for the property.
From this fact alone, it is insisted, the law presumes notice of the defective title of his vendor. The autliori-ities referred to on this point, are not very satisfactory, nor do they agree. Mr. Rawle, in his work on Covenants for Title, seems to be of opinion, that no presumption of notice can properly arise from the absence of general covenants in the deed: page 561.
On the other hand, Justice Story, in the case of Oliver vs. Piatt, 3 Howard’s Rep., 333, regards it as an important circumstance, that a quit claim deed only was given — the legal effect of which was, to convey merely the vendor’s interest in the property; and under such circumstances, *460 he says, it is difficult to conceive how the purchaser can claim protection as a bona fide purchaser, for a valuable consideration, without notice, against any title paramount to that of the vendor which attached itself as an unextinguished trust, to the property. There is much plausibility in this view.
The quit claim deed merely places the purchaser in the shoes of his vendor, with reference to the title, and only protects him against the claims of the latter as those deriving title under him ; whereas, the general covenant of warranty secures him against all persons setting up claim by title ; that is, against all but naked trespassers.
The rule is well settled, and is presumed to be known to every purchaser of real property, that, in the absence of fraud, his only indemnity, in case of failure of title, depends upon the covenants in his deed ; and if he accepts a deed without sufficient covenants for his security, and there be no element of fraud, mistake, or other equity in the transaction, he takes the title at his own risk, and is without remedy, either at law or in equity, in the event of failure of title : 4 Kent’s Com., 522, 523, and notes.
From this established principle of law, and the almost invariable usage, with us, of requiring general covenants, it would seem that the vendor’s refusal to give, and the purchaser’s agreement to accept a deed, without such covenants, furnish a reasonable ground of presumption of mutual knowledge, or, at least, of suspicion, of some defect of title.
To what else can the conduct of the parties, in omitting the usual covenants, be attributed.
At all events, the refusal of the vendor to take upon *461 himself the ordinary liabilities in such cases, must be regarded as sufficient, unless satisfactorily explained, to put every one of ordinary prudence upon inquiry as to the source and validity of the title thus brought under suspicion, by the mere refusal of the vendor to give the general covenant usual in such cases.
There is no explanation in the present case to repel the presumption thus arising.
And this presumption, especially when coupled with the additional presumption arising from the intimate relations .between the defendant and Allman, and the means of knowledge open to the former as to the circumstances and condition of the latter, we think entirely sufficient to charge the defendant with constructive, if not actual, notice of the trust attached to the property in favor of the complainants.
In this view, the case may be disposed of, leaving out of view altogether, the testimony of Mrs. Allman.
Decree for complainants.